UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:12-cr-182 |
| v. | ) | |
| | ) | Hon. Claude M. Hilton |
| HENOCK GHILE, | ) | |
| | ) | Sentencing Date: September 7, 2012 |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES
## WITH RESPECT TO SENTENCING

The United States of America, by undersigned counsel, hereby submits its position on the sentencing of the defendant, Henock Ghile. According to the Presentence Report, the defendant's Sentencing Guidelines range is 188 to 235 months of imprisonment. For the reasons stated below, the government requests that this Court impose a sentence at the low end of the Guidelines range.

## BACKGROUND

In November 2011, the Fairfax County Police Department and the FBI launched an investigation into the sex trafficking activities of the Underground Gangster Crips ("UGC"), a Fairfax County-based "set" affiliated with the Crips gang. Based on extensive victim and witness interviews, physical surveillance, electronic evidence, and the execution of multiple search warrants, law enforcement determined that UGC members and associates had engaged in the exploitation and victimization of at least eight juvenile females, ages 15 to 17, as well as adult females, for an approximately five-year period ending in March 2012.

As explained in more detail in the Presentence Report, the evidence shows that UGC's recruitment efforts were multifaceted: UGC enticed juveniles and adults online through social

media websites such as Facebook, MySpace, and Datehookup; in person at Metro stations and bus stops; and in area high schools and even a local juvenile detention center. When encountering potential victims, the pitch was invariably the same: Recruits were told that they looked pretty and were asked whether they wanted to make lots of easy money. And once enticed into the enterprise, the execution of the scheme was methodical: UGC members and associates groomed new recruits into commercial prostitution, beginning with a "demo" or "tryout" in which the victim engaged in sex with one or more members of the enterprise, after which an experienced female participant in the scheme (often referred to as the "Head Bitch in Charge" or "HBIC") would explain the gang's rules and procedures, even going so far as to allow the recruits to "watch and learn" as the HBIC or another female engaged in sex acts for money. UGC members and associates then would purchase condoms at local pharmacies and convenience stores and drive the victims to area neighborhoods—including Chirilagua in Alexandria, Commerce Street in Springfield, and Ballston in Arlington. Once there, the victims were instructed to walk through apartment complexes, going door-to-door to solicit customers while accompanied by a male bodyguard from the gang. The going rate for sex with an underage girl typically was $30-$40 for 15 minutes of sex, and each victim often had sex with multiple men in one night (usually about 5-10 customers) and over the course of multiple weekdays or weekends (including as much as seven days a week).

Although the evidence suggests that many of the victims initially began prostituting voluntarily, it is also clear that methods of force, fraud, and coercion were pervasively used by the gang to recruit and maintain control over victims, both in overt and subtle ways. Members of the enterprise, for example, concocted fake profiles on Facebook.com in female names such as "Rain Smith," "Mimi Jackson," and "Aaliyah Marie," using those profiles to send hundreds of

messages recruiting potential victims. Some victims were told that they would only be involved in dancing, stripping, or escorting, rather than sex, and the coconspirators further enhanced the bait-and-switch by sometimes providing only a fraction of the proceeds initially promised to victims. In addition, members invoked the gang to intimidate or coerce the victims into sexual activity, at times claiming that a "demo" with the members would serve as a form of "initiation" into the gang. The coconspirators also regularly plied the victims with alcohol and drugs, including cocaine, PCP, ecstasy, and marijuana, in order to reward the victims and keep them sedated or compliant. And when all of this failed, members did not hesitate to engage in force where necessary, choking one victim when she stated that she no longer wished to participate, allegedly assaulting and forcing another victim to engage in oral sex at knifepoint, beating and assaulting one victim who attempted to separate herself from the enterprise, and engaging in domestic violence in front of victims.

In March 2012, five UGC gang members and associates, including Ghile, were charged with conspiracy to engage in sex trafficking of minors in violation of 18 U.S.C. § 1594, and each of the defendants subsequently pleaded guilty to one count of juvenile sex trafficking under § 1591(a)(1).[1] As part of his statement of facts, Ghile has acknowledged participating in the sex trafficking of two victims in 2011—S.S. and A.B., each of whom was 17 years old at the time of the offenses. During the course of that conduct, Ghile drove the victims and coconspirators to the neighborhoods where the prostitution occurred. Ghile also received a portion of the proceeds

---

[1] Michael Jefferies (1:12-cr-143) was sentenced on July 6, 2012 before the Honorable Leonie M. Brinkema. Donyel Dove (1:12-cr-184) was sentenced on August 10, 2012 before the Honorable Anthony J. Trenga. Christopher Sylvia (1:12-cr-128) was sentenced on August 17, 2012 before the Honorable Gerald Bruce Lee. Justin Strom (1:12-cr-159) will be sentenced on September 14, 2012 before the Honorable James C. Cacheris.

from the prostitution and engaged in sexual conduct with newly recruited girls as part of UGC's purported "tryout" process.

As a result of his guilty plea, Ghile faces a statutory maximum term of life imprisonment, and a mandatory minimum term of imprisonment of ten years. 18 U.S.C. § 1591(b)(2). Ghile's Guidelines range is 188 to 235 months of imprisonment.

## ARGUMENT

I.  **Applicable Sentencing Law**

A sentencing court considers both the Sentencing Guidelines and other statutorily prescribed factors. *See* 18 U.S.C. § 3553(a); *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). To determine a sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *Hughes*, 401 F.3d at 546. "Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id.* at 546. Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

Although the Sentencing Guidelines are advisory and are only one of the factors listed in § 3553(a), the Guidelines assist the court by "'provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities.'" *United States v. Booker*, 543 U.S. 200, 264 (2005) (quoting 28 U.S.C. § 991(b)(1)(B)); *see also* 18 U.S.C. § 3553(a)(6). Indeed, in the ordinary case, there will be a significant amount of overlap between the Guidelines range and the remaining § 3553(a) factors because the Guidelines "reflect a rough

approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). The Guidelines, for example, encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an Offense Level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflecting "the history and characteristics of the defendant" (most notably by establishing a Criminal History Category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1). The Guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they are sentenced. 18 U.S.C. § 3553(a)(6); *see Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Thus, although the Guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49.

## II.  Sentencing Guidelines Calculation

The United States concurs in the Probation Office's Guidelines calculation.[2] The base offense level for sex trafficking of a juvenile older than 14 is 30. U.S.S.G. § 2G1.3(a)(2). The offense level is increased by two levels because the commercial prostitution offenses involved the commission of a sex act, *id.* § 2G1.3(b)(4)(A); and by an additional two levels based on the number of juvenile victims, *id.* § 3D1.4. After a three-level reduction for acceptance of

---

[2] The United States also concurs with the Probation Office's responses to the defendant's objections to the Presentence Report, as outlined in the August 27, 2012 addendum to the PSR.

5

responsibility, Ghile is subject to a total Offense Level of 31.[3]  Moreover, because Ghile's conduct involved a pattern of activity involving prohibited sexual conduct, the offense level total is increased by five levels to 36.  *Id.* § 4B1(b)(1).  Ghile is in Criminal History Category I, resulting in a Guidelines range of 188 to 235 months of imprisonment.

### III.     A Total Sentence of 188 Months Is Appropriate Based on the § 3553(a) Factors.

A sentence of 188 months' imprisonment, at the low end of the Guidelines, is necessary and sufficient to account for the sentencing factors listed in 18 U.S.C. § 3553(a):

**The Nature, Circumstances, and Seriousness of the Offense, and the Need for Just Punishment (§ 3553(a)(1), (a)(2)(A))**

Particularly important in this sentencing calculus is the nature and circumstances, as well as the seriousness, of the underlying offense, which involved the sex trafficking of juveniles for money through the use of force, fraud, and coercion.

The impact of this sex trafficking conspiracy on its juvenile victims likely will be profound and long-lasting.  The enterprise arranged for its victims, young girls who were 15 to 17 years old, to have sex with multiple men, day after day, without regard to their physical and mental health.  Such conduct is explained by the conspirators' view of these girls—namely, as commodities that could be used for their financial and sexual benefit.

The law properly recognizes that children are more vulnerable than adults.  Children, even those who are 15 to 17 years old, are more easily manipulated and coerced based on their limited life experiences and still-developing judgment.  For instance, one victim told

---

[3] The United States moves this Court pursuant to U.S.S.G. § 3E1.1 to grant a three-level reduction in the defendant's offense level for acceptance of responsibility.  The defendant assisted authorities in the investigation and prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.

investigators that she responded to Justin Strom's recruitment because she needed money, reasoning that she could use her earnings to buy nicer clothes so that she would be more popular in high school.

The conspirators seized on these traits to recruit and entice their victims, often through a combination of fraud and flattery. Many of the victims were recruited through false internet profiles, in which the conspirators posed as females, complimented the victim's good looks, and held out the promise of earning easy money. Some victims were assured that the job only involved dancing, stripping, or escorting, and not any sex acts, but once the victims met in person with the conspirators, they were quickly steered into prostitution. The juvenile victims, moreover, were required to take nude pictures and/or engage in a "demo," in which the victim had sexual contact with multiple conspirators—practices that not only served to satisfy the warped sexual urges of the conspirators, but also to groom the girls for later commercial sex acts.

Juveniles also are more likely to remain in a dangerous and damaging situation such as this prostitution scheme. Once the girls started to work as prostitutes, the conspirators used coercion, threats, and in some cases, force, to retain control over their victims. The conspirators, for example, invoked their gang membership or association with UGC to obtain "initiation" sex or keep victims in line—conduct that many of the victims found particularly coercive. One victim, for example, stated that she was aware of the Crips street gang and believed her safety was in jeopardy if she refused to continue working. Other victims have described threats and physical assaults from members of the conspiracy, including one victim who was choked when she stated that she no longer wished to participate, another who allegedly was assaulted and forced to engage in oral sex at knifepoint, and another who endured a beating when she attempted to separate herself from the enterprise.

In addition, the conspirators provided the girls with drugs and alcohol, both as payment for their work and to keep them compliant. At least one victim used cocaine for the first time when it was provided by a coconspirator, and another victim described how she was unable to escape the grips of the enterprise because her desire to stop prostituting was overwhelmed by her need to continue taking the drugs provided by her victimizers.

**History and Characteristics of the Defendant, Role in the Offense, and the Need for Incapacitation (§ 3553(a)(1), (a)(2)(C))**

A total sentence of 188 months also properly reflects the history and characteristics of the defendant and his role in the offense, as well as satisfying the need to protect the public from any further criminal activity by Ghile.

The roles played by each defendant in the prostitution scheme were relatively well-defined: Justin Strom was the leader and organizer of the operation, extensively involved in the online recruitment of victims, the grooming process, and overseeing the enterprise, while he nevertheless limited his public involvement in order to limit his risk of detection. Dove and Sylvia both drove and walked with the girls as bodyguards, and were involved in the enterprise as early as 2006 or 2007. Ghile served as a driver starting in spring 2011, while Michael Jefferies served as a driver and bodyguard for approximately two months in late 2011.[4] Several defendants, including Ghile, engaged in "demos" of new recruits, and some conspirators carried guns while participating in the enterprise.

Although Ghile was not the organizer or leader of this enterprise, he nevertheless was an integral part of the operation, sometimes driving the victims and coconspirators to their targeted

---

[4] Ghile and Jefferies left the conspiracy on their own prior to their arrests.

neighborhoods. Ghile also received a portion of the proceeds from the prostitution[5] and engaged in sex with some of the newly recruited underage girls.[6] In short, Ghile was no passive bystander in the operation but instead was actively involved in the enterprise.[7]

**Disparity, Deterrence, and Respect for the Law (§ 3553(a)(2)(A), (a)(2)(B), (a)(6))**

A total sentence of 188 months in prison, moreover, will promote respect for the law, deter the defendant and others from similar acts, and avoid unwarranted sentencing disparities.

---

[5] As stated in the Presentence Report, Ghile maintains that "the money he received was for costs associated with gas, alcohol, or food, and not a percentage of the prostitution proceeds." PSR ¶ 33 n.4. This distinction, however, is immaterial: Even if Ghile did not receive a specific percentage of the prostitution proceeds, the money that he did receive for items such as gas, alcohol, and food (as well as straight cash payments) was paid out of the money that the coconspirators obtained through the prostitution scheme.

[6] The fact that Ghile, now age 23, was approximately five years older than the juvenile prostitutes does not warrant a downward departure under U.S.S.G. §§ 5K2.22(1) and 5H1.1 due to the defendant's age. As stated in § 5H1.1, such considerations are relevant only where they "are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." Ghile's age, however, does not differ significantly from two of his codefendants (Jefferies, 21, and Sylvia, 23), or from the ages of the defendants who have been prosecuted since 2011 in other gang-related sex trafficking cases in this District, who ranged from ages 19 to 24. Ghile's argument, moreover, based upon his "[l]ack of maturity" and "poor judgment," would appear to be somewhat at odds with his emphasis on the fact that he has been attending school, working at UPS, and living with strong support at home and in his community. Def.'s Position with Regard to Sentencing at 6, 8-9.

[7] As noted in the addendum to the Presentence Report, Ghile argues that he should receive a minor role reduction. PSR at A-1. Section 3B1.2(b) of the Guidelines, however, provides an adjustment for a defendant who is substantially less culpable in committing the offense than the average participant. U.S.S.G. § 3B1.2, Application Note 3(A). "A defendant seeking a downward adjustment for his minor role in a criminal offense bears the burden of proving by a preponderance of the evidence that he is entitled to such adjustment." *United States v. Nelson*, 6 F.3d 1049, 1058 (4th Cir. 1993), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995). "The critical inquiry is thus not just whether the defendant has done fewer 'bad acts' than his codefendants, but whether the defendant's conduct is material or essential to committing the offense." *United States v. Palinkas*, 938 F.2d 456, 460 (4th Cir. 1991), *vacated*, 503 U.S. 931 (1992), *reinstated*, *United States v. Kochekian*, 977 F.2d 905 (4th Cir. 1992). Ghile's conduct, as described in this memorandum, shows that he was intimately involved in the conspiracy by serving as a driver and engaging in sex with juvenile victims. Ghile's role thus cannot be described as minimal or minor.

Judges in this District have consistently imposed significant sentences for gang-related sex trafficking convictions under 18 U.S.C. § 1591. In *United States v. Jose Ciro Juarez-Santamaria* (1:11-cr-217), the defendant was sentenced to <u>life imprisonment</u> (the Guideline sentence) for prostituting a 12-year-old girl and allowing his fellow MS-13 members to have sex with her for free. In *United States v. Rances Amaya* (1:11-cr-556), the defendant was sentenced to <u>600 months</u> in prison (within the Guidelines range of 360 months to life imprisonment) for assisting another MS-13 member in running a juvenile prostitution business involving at least three juveniles by providing security and threatening the victims. In *United States v. Alonso Bruno Cornejo Ormeno* (1:11-cr-260), the defendant was sentenced to <u>292 months</u> in prison (the low end of the Guidelines range) for recruiting four juvenile prostitutes and managing all aspects of the prostitution ring. In *United States v. Ramiro Espinoza Jamaica* (1:12-cr-91), the defendant was sentenced to <u>168 months</u> in prison (within the Guidelines range) for trafficking a 14-year-old girl on a single occasion. And in *United States v. Alexander Rivas* (1:11-cr-166), the defendant was sentenced to <u>120 months</u> of imprisonment (below the low end of the Guidelines range of 168 months) for recruiting two juvenile runaways to work as prostitutes.

Despite the significant sentences imposed in these recent cases, Ghile seeks a mandatory minimum sentence of 120 months—below the Guidelines range of 188 to 235 months—on the ground that two of his codefendants, Michael Jefferies and Christopher Sylvia, have received a sentence of 120 months in prison. Neither defendant's sentence, however, provides the appropriate benchmark for sentencing Ghile.

With regards to the sentence imposed on Jefferies, the record shows that both Ghile and Jefferies drove juvenile victims to engage in prostitution, and both defendants had sex with underage girls as part of UGC's purported "demos." Although Ghile did not also walk with the

10

girls as a bodyguard (unlike Jefferies), and although Ghile has a less serious criminal record than Jefferies (Criminal History Category I versus Category III), it is also clear that Ghile was involved in the prostitution enterprise for a longer period of time—approximately ten months from March to December 2011, compared to approximately two months for Jefferies. The Honorable Leonie M. Brinkema relied on multiple grounds for sentencing Jefferies to 120 months—which constituted a 59% variance from the low end of the Guidelines range of 292-365 months—but one of the relevant factors was that Jefferies spent the least amount of time in the enterprise in comparison to his codefendants, including Ghile. Strictly speaking, Ghile was involved for a period lasting about five times as long as Jefferies (ten months versus two months), and thus even assuming *arguendo* that the significant variance granted Jefferies was warranted, it is still appropriate for this Court to sentence Ghile to a longer term of incarceration than Jefferies.

The comparison between Ghile and Sylvia, however, is more complex. Sylvia was involved intermittently in the prostitution enterprise over a period of several years from about 2006 or 2007 to early 2012, whereas Ghile's involvement was limited to an approximately 10-month period in 2011 (and ended with Ghile's voluntary withdrawal from the enterprise). Sylvia, moreover, has a greater criminal history than Ghile (Criminal History Category V versus Category I), and Sylvia not only drove the juvenile victims (like Ghile), but also walked with the prostitutes as a bodyguard and allegedly possessed a gun in his car. Sylvia, however, did not engage in sex with any of the juvenile victims, as opposed to Ghile, who participated in the "demo" process with newly recruited girls.

Although the Court certainly must consider the sentence imposed on Sylvia by the Honorable Gerald Bruce Lee, and Sylvia's culpability relative to that of Ghile, the Court must

also determine whether the sentence imposed upon Sylvia was appropriate in light of his reprehensible conduct. The government respectfully submits that the sentence imposed upon Sylvia—which represented a variance of approximately 67% from the low end of the Guidelines range of 360 months to life—was not appropriate in light of *all* of the § 3553(a) factors, particularly the nature and circumstances of the offense and the history and characteristics of the defendant.[8]

In addition to implicating concerns about sentencing disparity—which is only one of the factors listed in § 3553(a)—this case, along with the recent increase in gang-related juvenile sex trafficking prosecutions in this District, underscores the need for deterrence, both general and specific, of such conduct. Gang members and associates—as well as independent pimps who have no apparent connection to gangs or organized crime—have turned to sex trafficking because it is seen as a lucrative enterprise with low start-up costs, a readily replenished supply of victims, and significant demand in a marketplace that operates both online and on the street. Gang members and associates, whether in MS-13, the Crips, or other organizations, as well as other sex traffickers, must not be allowed to conclude that juvenile prostitution is a viable business enterprise, or that they will be punished lightly if caught. And the victims of such conduct—past, present, and future—should also be able to conclude that, once sex traffickers are apprehended, justice will be done.

---

[8] As the government argued at Sylvia's sentencing, Sylvia's role was more comparable to that of Donyel Dove, who was sentenced by the Honorable Anthony J. Trenga to a total of 276 months of imprisonment, consisting of 216 months for the sex trafficking offense and a consecutive term of 60 months for an unrelated gun charge under 18 U.S.C. § 924(c).

## **CONCLUSION**

A substantial period of incarceration is fair, just, and necessary in this case. Accordingly, for the reasons stated above, the government requests that the Court impose a sentence of 188 months of imprisonment.

                          Respectfully submitted,

                          Neil H. MacBride
                          United States Attorney

By:        /s/
                    Marc J. Birnbaum
                    Special Assistant United States Attorney (LT)
                    Inayat Delawala
                    Assistant United States Attorney
                    Counsel for the United States
                    United States Attorney's Office
                    2100 Jamieson Avenue
                    Alexandria, Virginia 22314
                    (703) 299-3700 (phone)
                    (703) 299-3982 (fax)
                    marc.birnbaum@usdoj.gov
                    inayat.delawala@usdoj.gov

Dated: August 31, 2012

CERTIFICATE OF SERVICE

I certify that on August 31, 2012, I electronically filed the foregoing memorandum with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the following:

Andrea L. Moseley
Zwerling, Moseley, & Sears, P.C.
114 North Alfred Street
Alexandria, VA 22314
(703) 684-8000
andrea@zwerling.com

By:      /s/
Inayat Delawala
Assistant United States Attorney
Counsel for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700 (phone)
703-299-3982 (fax)
inayat.delawala@usdoj.gov